**UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
EASTERN DIVISION**

———————————————————————

IN RE:
ERNEST E. JAASKELAINEN and
KATHLEEN M. JAASKELAINEN,
       DEBTORS.

Chapter 13
Case No. 07-12832-WCH

———————————————————————

ERNEST E. JAASKELAINEN and
KATHLEEN M. JAASKELAINEN,
       PLAINTIFFS,

v.

Adversary Proceeding
No. 07-01242

WELLS FARGO BANK, N.A., in trust for the
Certificateholders of Carrington Mortgage Loan
Trust, Series 2006-OPT1 Asset Backed Pass-
Through Certificates, and OPTION ONE
MORTGAGE CORPORATION,
       DEFENDANTS.

———————————————————————

**MEMORANDUM OF DECISION**

## I. INTRODUCTION

    The matters before the Court are the Complaint filed by Ernest E. and Kathleen M.

Jaaskelainen (collectively, the "Debtors") against Wells Fargo Bank, N.A. ("Wells Fargo") and

Option One Mortgage Corporation ("Option One") (collectively, the "Defendants") alleging

violations of the Massachusetts Consumer Credit Cost Disclosure Act[1] ("CCCDA") and the Debtors'

Objection to Claim #1 filed by Option One (the "Objection"). The Debtors seek, *inter alia*,

---

[1] Mass. Gen. Laws ch. 140D, § 10.

1

rescission of a refinancing transaction and declarations that the mortgage granted to the Defendants

is void and that the Debtors have no tender obligation to effectuate the rescission.  For the reasons

set forth below, I will enter judgment for the Debtors and sustain the Objection.

## II. <u>BACKGROUND</u>

The facts of this case are largely in dispute.  This is further complicated by the fact that no

witness appears to have an independent recollection of the determinative facts and circumstances

surrounding the underlying transaction or subsequent events.  The parties have, however, stipulated

to some undisputed facts.

In November, 2005, the Debtors were facing an impending foreclosure of their home at 11

Howarth Avenue in Attleboro, Massachusetts (the "Property") by Countrywide Home Loans.  In an

effort to stave off foreclosure, the Debtors entered into a consumer credit transaction (the

"Refinancing") with Option One on November 28, 2005.[2]  The Debtors testified that the closing

occurred at the Property around 7:30pm and took approximately one hour.[3]  In connection with the

Refinancing, the Debtors executed a note and mortgage to Option One secured by the Property.[4]  The

HUD-1 Settlement Statement reveals the total loan amount was $158,950, $13,624.29 of which went

to the Debtors.[5]

Attorney Robert P. Marks ("Attorney Marks"), was engaged by Professional Settlement

---

[2] Joint Pre-Trial Statement ("PTS"), Docket No. 46,  ¶ II.1.

[3] Trans. April 29, 2008 at 30, ¶ 3-4; 31, ¶11-15.

[4] PTS at ¶ II.2.

[5] Plaintiff's Ex. 3.

Services ("PSS") to act as closing agent for the Refinancing.[6]  By 2005, he had approximately 20 years experience and completed over two thousand closings.[7]  At trial, Attorney Marks testified that he had no specific recollection of the Refinancing, and did not retain a copy of the Debtors' closing documents in his records.[8]  As such, he could only state what his practice was at that time.

In his capacity as closing agent, Attorney Marks was responsible for printing out the closing documents, presiding over the closing, and returning the signed documents to the lender.[9]  He testified that he would typically receive a set of closing documents from PSS as an attachment to an email.[10]  Upon receipt, it was his office's procedure to first print out the documents.[11]  This process could take up to forty-five minutes depending on the file and printer.[12]  After the closing documents were printed, Attorney Marks' secretary would make a duplicate set for the borrowers.  Borrowers received either a stapled legal sized single-sided copy, or an 8.5" x 11" double-sided copy bound with a plastic comb.[13]  Generally, it took about five minutes longer to prepare the bound 8.5" x 11" double-sided copy of the closing documents.[14]  A bound booklet, opposed to the stapled copies, was

---

[6] Trans. April 29, 2008 at 116, ¶ 2-9.

[7] *Id.* at 116, ¶ 1; 134, ¶ 3-6.

[8] *Id.* at 119, ¶ 12-18.

[9] *Id.* at 117, ¶ 2-8.

[10] *Id.* at 118, ¶ 4-8.

[11] *Id.* at 118, ¶ 14-17.

[12] *Id.* at 129, ¶ 1-7.

[13] *Id.* at 120, ¶ 5-17; 130, ¶ 10-13.

[14] *Id.* at 129, ¶ 15-24.

prepared a majority of the time.[15]

Among the documents contained within the bound booklet was the Notice of Right to Cancel (the "NOR").  The NOR is a form notice mandated by the CCCDA, as well as the Truth in Lending Act[16] ("TILA")  and Regulation Z[17], which discloses a borrower's limited right to rescind the transaction.  On its face, the NOR states in relevant part:

> YOUR RIGHT TO CANCEL
> You are entering into a transaction that will result in a mortgage, lien, or security interest on/in your home.  You have a legal right under federal law to cancel this transaction, without cost, within three business days from whichever of the following events occurs last:
>
> (1) the date of the transaction, which is _____; (i.e., the date you signed your loan documents) or
> (2) the date you received your Truth in Lending disclosures; or
> (3) the date you received this notice of your right to cancel.
>
> * * *
>
> If you cancel by mail or telegram, you must send the notice no later than midnight of _____ (or midnight of the third business day following the latest of three events listed above).  If you send or deliver your written notice to cancel some other way, it must be delivered to the above address no later than that time.[18]

The bottom of the NOR contains the following acknowledgment (the "Acknowledgment") and an area for the borrowers' signatures:

> ON THE DATE LISTED ABOVE I/WE THE UNDERSIGNED EACH RECEIVED TWO (2) COMPLETED COPIES OF THE NOTICE OF RIGHT TO CANCEL IN THE FORM PRESCRIBED BY LAW ADVISING ME/US OR MY/OUR RIGHT

---

[15] *Id.* at 140, ¶ 5-11.

[16] 15 U.S.C. § 1601 *et seq.*

[17] 12 C.F.R. § 226.1 *et seq.*

[18] 12 C.F.R. Pt. 226, App. H-8.

TO CANCEL THIS TRANSACTION.[19]

Attorney Marks testified that PSS would always send either three or six copies of the NOR, depending on whether both borrowers' names appeared on the document.  When both borrowers' names appeared on the NOR, there would be three in the set he received.  It was Attorney Marks' practice, however, to remove two copies of the NOR from his set and pass them across the table to the borrowers at the closing.[20]  This means that borrowers, such as the Debtors, would receive a total of five NORs: three copies in the bound closing booklet; and two loose copies handed to them at the closing.[21]  The borrowers would then execute the acknowledgment on the remaining NOR in Attorney Marks' set, and he would fax it to the lender.[22]

Mrs. Jaaskelainen testified that at the closing Attorney Marks showed the Debtors each document and briefly explained it to them before they signed.[23]  This is consistent with Attorney Marks' testimony as to his routine.[24]  Neither Debtor asked Attorney Marks any questions at the closing.[25]  Mrs. Jaaskelainen further testified that Attorney Marks specifically explained the NOR to them, and that the Debtors executed the Acknowledgment.[26]  The Debtors, as well as Attorney

---

[19] *Id.*

[20] Trans. April 29, 2008 at 142, ¶ 20-25; 145, 10-14; 146, 15-24.

[21] *Id.* at 143, ¶ 6-7.

[22] *Id.* at 136, ¶ 2-5.

[23] *Id.* at 31, ¶ 14-18

[24] *Id.* at 134, ¶ 3-6.

[25] *Id.* at 42, ¶ 14-25; 43, ¶ 1.

[26] *Id.* at 46, ¶ 1-12; Defendants' Ex. 1.

Marks, also signed a six-page document entitled "Instructions to Closing Agent" which stated in

relevant part:

> 1. CLOSING AGENT MUST PROVIDE EACH BORROWER AND PERSON
> WITH OWNERSHIP INTEREST IN THE PROPERTY TWO (2) COMPLETED,
> SIGNED, AND DATED COPIES OF THE NOTICE OF RIGHT TO CANCEL AT
> THE TIME OF EXECUTION OF THE LOAN DOCUMENTS.[27]

At the conclusion of the closing, Attorney Marks executed an Affidavit of Settlement Agent in which

he certified that:

> On the Settlement Date, each person who signed the Promissory Note and/or the
> Mortgage/Deed of Trust/Security Deed as a borrower and/or Mortgagor/Trustor, and
> each person with an ownership interest as determined by applicable state law,
> respectively, received (a) one copy of the Truth-In-Lending Disclosure and (b) two
> copies of the Notice of Right to Cancel with the dates completed.
>
> I further certify that each such person acknowledged, in writing and before me on the
> Lender's copy of the Notice of Right to Cancel, his/her receipt of the two copies of
> the Notice of Right to Cancel with the dates completed.[28]

Despite having executed this affidavit, Attorney Marks testified at trial that he never took any

independent action to confirm that the bound closing booklet given to any borrower contained

sufficient copies of the NOR.[29]  Instead, he relied on PSS to provide a set of closing documents with

the correct number of copies of the NOR.[30]  Curiously, he also stated he knew how many copies of

the NOR were enclosed in any bound closing booklet because he had an identical set.[31]

Although the Debtors both executed the Acknowledgment, both testified that they received

---

[27] Defendants' Ex. 2.

[28] Defendants' Ex.23.

[29] Trans. April 29, 2008 at 144, ¶ 7-12.

[30] *Id.* at 144, ¶ 17-19.

[31] *Id.* at 144, ¶ 15-16.

no documents at the closing.[32]  Mrs. Jaaskelainen testified that they received a bound set of their

closing documents (the "Closing Booklet") approximately three to five days after the closing.[33]  Mr.

Jaaskelainen had no independent memory beyond finding the Closing Booklet on their kitchen table

at some point after the closing.  At this time, neither Debtor noted the number of copies of the NOR

were contained in the Closing Booklet.[34]  These copies, however, reflected the deadline for

exercising the right to rescind was December 1, 2005, calculated as three business days after the

Refinancing.[35]  After the Debtors reviewed the Closing Booklet, either separately or together, Mr.

Jaaskelainen placed the it in a file cabinet.[36]  Mrs. Jaaskelainen described the file cabinet as being

in their bedroom and without a lock.[37]  Within the filing cabinet, the Debtors also separately kept

other important documents, including their daughter's school records.[38]  Mrs. Jaaskelainen admitted

that her daughter had access to the file cabinet and may have from time to time retrieved things from

it at her request, but that she had no present memory of making such a request and never had with

respect to the Closing Booklet.[39]

By September, 2006, the Debtors defaulted on their loan payments.  By this time, the

---

[32] *Id.* at 31, ¶ 19-22; 32, ¶ 1-4.

[33] *Id.* at 32, ¶ 25; 33, ¶ 1-6.

[34] *Id.* at 46, ¶ 1-12.

[35] Defendant's Ex. 1.

[36] Trans. April 29, 2008 at 74, ¶ 6-10.  Mrs. Jaaskelainen previously testified that she did not recall who placed the Closing Booklet into the cabinet.  *Id.* at 48, ¶ 21-24.

[37] *Id.* at 36, ¶ 16-17; 47, ¶ 8-11.

[38] *Id.* at 68, ¶ 2-5.

[39] *Id.* at 68, ¶ 2-16.

obligation had been assigned to Wells Fargo.[40]  Wells Fargo commenced foreclosure proceedings

in February, 2007.  In March, 2007, the Debtors met with Attorney Theodore J. Koban ("Attorney

Koban"), to discuss bankruptcy.[41]   At the initial meeting, Attorney Koban inquired about the

Debtors' debts, income, and expenses in order to get a financial overview of their predicament.[42]

During the course of this discussion, Mrs. Jaaskelainen mentioned the Refinancing and indicated that

a higher than expected payment was the cause of their cash flow problems.[43]  In response, Attorney

Koban requested that the Debtors provide him with the Closing Booklet and the loan documentation

in their possession.[44]

   The Debtors brought Closing Booklet to Attorney Koban's office and left it with his

secretary.[45]  Attorney Koban has no present knowledge as to how the Closing Booklet appeared at

his office.[46]  Neither Debtor recalls who took the Closing Booklet out of the file cabinet, but both

testified credibly that Mr. Jaaskelainen dropped it off at Attorney Koban's office and retrieved it

--------

[40] PTS at ¶ II.4; Defendant's Ex. 22.

[41] Trans. April 29, 2008 at 92, ¶ 11-18.

[42] *Id.* at 92, ¶ 19-25.

[43] *Id.* at 93, ¶ 1-7.  By way of background, Mrs. Jaaskelainen testified that the interest rate initially offered to them was lower than the closing rate.  *Id.* at 56-59. Documents were introduced into evidence demonstrating that the Debtors were given two preliminary TILA disclosures prior to the closing.  The first indicated an interest rate of 10.25%, while the second 12.073%.  Defendants' Ex. 3, 4.  At the closing, the Debtors were given a final TILA disclosure setting the interest rate at 11.946%.  Plaintiff's Ex. 7.  This issue, however, is not relevant to this to this proceeding.

[44] Trans. April 29, 2008 at 105, ¶ 1-11.

[45] *Id.* at 105, ¶ 13-15.

[46] *Id.*

8

approximately one day later.[47]

Attorney Koban testified that on review of the documents, it was unclear to him why the interest rate increased from the preliminary disclosure to the final closing rate.[48] Believing an issue may have existed, Attorney Koban contacted Attorney Kenneth D. Quat ("Attorney Quat") and requested that he look into it.[49] He did not note the number of copies of the NOR in the Closing Booklet as he was unaware that it was a significant issue.[50] Attorney Koban then personally unbound the Closing Booklet by bending back the plastic comb and removing pages.[51] He explained that this was done for the purpose of placing the loose Closing Booklet pages into the automatic document feeder of his photocopy machine.[52] Attorney Koban was present during the entire copying process and stated that no jams or other copier malfunctions occurred.[53] Rather than reinsert the binding, which would have been time consuming, Attorney Koban assumed that additional copies may be needed in the future for discovery or litigation, and therefore opted to binder clip the Closing Booklet

---

[47] *Id.* at 37; ¶ 7-25; 38, ¶ 1-5; 74, ¶ 17-23.  At her deposition, Mrs. Jaaskelainen apparently stated that she dropped the Closing Booklet off at Attorney Koban's office.  *Id.* at 51, ¶ 14-18.  At trial, she credibly testified that she must have misspoken, as a hip disability would have prevented her from climbing the stairs to his office. *Id.* at 40, ¶ 6-14.

[48] *Id.* at 95, ¶ 18-25.

[49] *Id.* at 94, ¶ 12-20.

[50] *Id.* at 108, ¶ 19-25; 109, ¶ 12-19.

[51] *Id.* at 97, ¶ 17-21; 98, ¶ 7-9.

[52] *Id.* at 98, ¶ 7-14.

[53] *Id.* at 98, ¶ 20-25.

back together.[54]  Afterward, he sent the photocopy to Attorney Quat.[55]  Attorney Koban testified that

he understood that the original Closing Booklet was returned to the Debtors, but did not specifically

know how.[56]

In April, 2007, The Debtors met with Attorney Quat.[57]  Presumably, it was during this time

that it was discovered that the Closing Booklet contained only two copies of the NOR on a single

double-sided sheet of paper.  On May 1, 2007, Attorney Quat, on behalf of the Debtors, sent written

notification to Wells Fargo requesting rescission of the Refinancing.[58]  The Debtors asserted that they

were entitled to an extended right of rescission under TILA and Regulation Z because they did not

each receive two copies of the NOR.[59]  Wells Fargo responded, through counsel, by a letter dated

May 3, 2007, stating that the Debtors were not entitled to rescind because they signed the

Acknowledgment, indicating that they had each received two copies of the NOR.[60]  On June 5, 2008,

the Debtors sent identical letters to Option One and received no response.[61]

On May 7, 2007, the Debtors filed a voluntary petition under Chapter 13.  In Schedule F -

Creditors Holding Unsecured Nonpriority Claims, the Debtors listed Option One as holding a claim

---

[54] *Id.* at 98, ¶ 14-19.

[55] *Id.* at 99, ¶ 4-8.

[56] *Id.* at 99, ¶ 20-21.

[57] *Id.* at 40, ¶ 21-24.

[58] PTS at ¶ II.5; Plaintiff's Ex. 11, 12.

[59] Plaintiff's Ex. 11, 12.

[60] Plaintiff's Ex. 15.

[61] Plaintiff's Ex. 13, 14.

10

in the amount of $181,976.90 in addition to $20,848 in other debt.[62]  On May 24, 2007, Option One

filed a proof of claim asserting a claim in the amount of $182,380.86 secured by real property.[63]  On

June 4, 2007, the Debtors filed an objection to Option One's claim on the basis that the Debtors

previously exercised their right to rescind the Refinancing by mailing notices to Wells Fargo, the

purported holder of the note.  Option One, as the servicer for Wells Fargo, subsequently filed a

response to the objection stating that the rescission was baseless and that the dispute would be

addressed through an adversary proceeding.

The present adversary proceeding was commenced on July 3, 2008.  The Debtors filed a

single count complaint in which they sought a judgment rescinding the Refinancing, voiding the

mortgage, ordering the Defendants return all funds received in connection with the Refinancing, and

awarding statutory damages and reasonable attorney's fees based upon Option One's alleged failure

to deliver two copies of the NOR to each Debtor in violation of 15 U.S.C. § 1635(a) and 12 C.F.R.

226.23.  On August 6, 2008, the Defendants filed an answer in which they asserted that the Debtors

received the correct number of copies of the NOR at the closing and therefore the Debtors' rescission

was not valid twenty-months after the closing.  The Debtors subsequently amended the Complaint

to substitute citations to TILA to those of the CCCDA, a statute modeled after TILA and otherwise

known as the Massachusetts Truth in Lending Act.[64]

---

[62] Docket No. 1.

[63] Claim No. 1.

[64] The Debtors actually sought to amend the Complaint to *add* a claim for rescission
under the CCCDA.  TILA, however, is not the law in Massachusetts as the Board of Governors
of the Federal Reserve System exempted credit transactions within Massachusetts subject to the
CCCDA from chapters two and four of TILA.  *See* 48 Fed. Reg. 14882, 14890 (1983); *Fidler v.
Cent. Coop. Bank (In re Fidler)*, 226 B.R. 734, 736 (Bankr. D. Mass. 1998); *Desrosiers v.
Transamerica Fin. Corp. (In re Desrosiers)*, 212 B.R. 716, 722 n.6 (Bankr. D. Mass. 1997).

A pre-trial order entered, and the parties filed a Joint Pre-Trial Statement as well as trial memoranda. I conducted a trial on the matter on April 29, 2008, at which five witnesses testified[65] and thirty-nine exhibits were admitted into evidence. Among those exhibits was the Closing Booklet binder clipped together and containing only two copies of the NOR printed on a single double-sided sheet of paper.[66] At trial, the Debtors admitted that their assertion that they did not receive sufficient copies of the NOR was based entirely on the present condition of the Closing Booklet. Attorney Marks testified that he could not state affirmatively whether the Closing Booklet, as it exists today, was its original form.[67] Attorney Koban similarly testified that he could not confirm that the Closing Booklet shown to him at trial was exactly what he received from the Debtors.[68] The duplicate made by Attorney Koban, however, was also admitted into evidence and contains only two copies of the NOR.[69] At the conclusion of the trial, I took the matter under advisement. Both parties submitted post-trial memoranda and a Post-Trial Stipulation stating that the total money or other property given by the Debtors in connection with the Refinancing was $16,143.32.[70]

---

Chapter two of TILA includes sections 1631 through 1646. As such, I construed the Motion to Amend as one to substitute the Massachusetts statute for the federal one, rather than add it.

[65] In addition to the Debtors, Attorney Marks, and Attorney Koban, Lisa Clary, the Legal Teams Action Lead for Option One, testified on behalf of the Defendants. Ms. Clary, however, had no first hand knowledge of this case and provided no meaningful testimony.

[66] Plaintiff's Ex. 7.

[67] Trans. April 29, 2008 at 142, ¶ 1-8.

[68] *Id.* at 111, ¶ 11-22.

[69] Plaintiff's Ex. 6.

[70] This consisted of $10,789.80 in interest paid and $5,354.52 in finance and other charges.

### III. **POSITIONS OF THE PARTIES**

The Debtors

The Debtors assert that the Defendants failed to provide each Debtor two copies of the NOR as required by the CCCDA and its implementing regulations.[71] This failure, they contend, gave rise to an extended rescission period, during which they validly exercised their right.[72] While the Debtors concede they signed the Acknowledgment, they argue that it does no more than create a rebuttable presumption of delivery.[73] The Debtors assert that they have successfully rebutted this presumption by testifying that they did not each receive a sufficient number of copies of the NOR and by introducing the Closing Booklet with only two copies of the NOR into evidence.

As the Debtors contend the burden of proof shifted, they further argue that the Defendants did not prove actual delivery occurred. The Debtors cite Attorney Marks' testimony with respect to his "routine practice" as the only evidence submitted by the Defendants to indicate a sufficient number of copies of the NOR were delivered beyond the executed Acknowledgment. This testimony, they argue, is insufficient against the "clear fact" that the Closing Booklet only contains two copies of the NOR where the Debtors and Attorney Koban have testified to its integrity. Moreover, they assert Attorney Marks' testimony should be given little weight because his secretary compiled the Closing Booklet.[74] The Debtors note that the sole witness called by the Defendants had

---

[71] 209 C.M.R. § 32.23(2)(a).

[72] Mass. Gen. Laws ch. 140D, § 10(f); 209 C.M.R. 32.23(1)(c).

[73] Mass. Gen. Laws ch. 140D, § 10(c).

[74] In their Post-Trial Memorandum of Law, the Debtors suggest I draw an adverse inference against the Defendants because they did not call Attorney Marks' secretary as a witness or offer any explanation for her absence. To the contrary, I do not find this significant as she, like every other witness, undoubtedly would not recall anything about this particular Closing

13

no knowledge of the number copies of the NOR that were transmitted to Attorney Marks or any steps taken by Option One to determine the existence of such information.

The Debtors also argue that the copies of the NOR contained within the Closing Booklet were legally insufficient because they set forth an incorrect expiration date for the period of rescission.  Because the copies of the NOR contained within the Closing Booklet indicated that the right to rescind expired on December 1, 2005, the third business day after the closing, the Debtors assert that they were defective because the Debtors did not receive the Closing Booklet, or any documents, until three to five days after the closing.  The Debtors rely on *Bell v. Parkway Mortgage, Inc.*,[75] *Riopta v. Amresco Residential Mortgage Corp.*,[76] and  *Taylor v. Domestic Remodeling, Inc.*,[77] for the proposition that an incorrect date on a NOR does not provide "clear and conspicuous" notice to the borrower.  At trial, the Debtors for the first time raised the argument that they effectively received only one copy of the NOR because the two copies were printed on single double-sided sheet of paper.[78]  I note that the Debtors have cited no authority for this proposition at trial or in their Post-Trial Memorandum of Law.

The Debtors further seek a determination that they have no obligation to tender funds back

---

Booklet.  In fact, I note that the Debtors have no independent recollection of their own Closing Booklet.

[75] *Bell v. Parkway Mortgage, Inc. (In re Bell)*, 309 B.R. 139, 157 (Bankr. E.D. Pa. 2004).

[76] *Riopta v. Amresco Residential Mortgage Corp.*, 101 F.Supp.2d 1326 (D. Haw. 1999).

[77] *Taylor v. Domestic Remodeling, Inc.*, 97 F.3d 96, 98-99 (5th Cir. 1996).

[78] Trans. April 29, 2008 at 16, ¶ 15-12.

14

to the Defendants in light of their bankruptcy filing.  Relying on *In re Myers*[79] and *In re Whitley*[80], the Debtors assert that it is well established in this district that tender is not a condition of rescission in Chapter 13.  To the extent that the Defendants argue that it would be inequitable not to require a tender, the Debtors aver that TILA violations are measured by a strict liability standard, imposing liability on creditors even for minor or technical violations.[81]

To the extent that the Defendants assert a bona fide error defense, the Debtors contend that it is not available in this case.  First, the Debtors argue that the Defendants presented no evidence that the errors were unintentional because Attorney Marks did not make multiple copies of the documents received from PSS and could not say how many copies of the NOR were included in the Closing Booklet.  Second, the defense is not available as a matter of law because the kinds of errors that are considered bona fide under the CCCDA do not include the failure to comply with the notice requirements.  The Debtors argue that this is an error of legal judgment, and not in the nature of a clerical or printing error as provided by the statute.[82]  Third, relying on the Seventh Circuit Court of Appeals decision in *Mirabel v. General Motors Acceptance Corp.*,[83] the Debtors assert that the bona fide error defense requires more than just procedures designed to provide adequate disclosure, but

---

[79] *Myers v. Fed. Home Loan Mortgage Co. (In re Myers)*, 175 B.R. 122 (Bankr. D. Mass. 1994).

[80] *Whitley v. Rhodes Financial Services, Inc. (In re Whitley)*, 177 B.R. 142 (Bankr. D. Mass. 1995).

[81] *See, e.g., Jones v. Novastar Mortgage, Inc. (In re Jones)*, 298 B.R. 451, 457 (Bankr. D. Kan. 2003).

[82] Mass. Gen. Laws ch. 140D, § 32(c).

[83] *Mirabel v. General Motors Acceptance Corp.*, 537 F.2d 871, 878 (7th Cir. 1976) *cert. denied* 439 U.S. 1039 (1978), *overruled on other grounds by Brown v. Marquette Sv. & Loan Ass'n*, 686 F.2d 608 (7th Cir. 1982).

an extra preventative step which the Defendants have not shown.[84]

The Defendants

The Defendants argue that the Debtors are not entitled to rescind the Refinancing because they failed to rebut the presumption of delivery created by their execution of the Acknowledgment. The Defendants assert that the Debtors' reliance on the present condition of the Closing Booklet is not a reliable measure of its original contents. Relying on *Gaona v. Town & Country Credit,*[85] the Defendants contend that the "folder theory" is unreliable and is insufficient to rebut the presumption of delivery. The Defendants argue that there are any number of explanations for the fact that the Closing Booklet currently contains only two copies of the NOR. They cite numerous facts demonstrating that the Debtors could not establish a reliable chain of custody for the Closing Booklet, including that the file cabinet was unlocked, that the Debtors' daughter had access to it, and that the Debtors provided inconsistent statements regarding the filing and removal of the Closing Booklet from the cabinet. Moreover, the Defendants contend that the removal of the binding by Attorney Koban casts doubt on the integrity of the Closing Booklet. They also note that the Debtors had possession of the Closing Booklet before and after meeting with Attorney Quat, and therefore could have removed pages if they wished.

The Defendants also argue that Attorney Marks' testimony establishes that the Debtors received the correct number of copies of the NOR. Attorney Marks' testimony states that the

---

[84] In their Trial Brief, the Debtors also argued that the bona fide error defense was waived by the Defendants because it was not included in their first responsive pleading as required by Fed. R. Civ. P. 8(c) and 12(b). This argument was not raised in their Post-Trial Memorandum of Law and is moot in light of the Defendants having raised it in their amended answer to the amended complaint.

[85] *Gaona v. Town & Country Credit*, No. 01-44-PAM/RLE, 2001 WL 1640100 (D. Minn. Nov. 20, 2001) *rev'd in part, aff'd in part*, 324 F.3d 1050 (8th Cir. 2003).

16

Debtors were given three copies in the Closing Booklet and two loose copies from the lender's set of documents for a total of five.  The Defendants contend that not only does Attorney Marks' testimony contradict the Debtors' statements that they did not receive documents at the closing, but that it proves that the Closing Booklet is not in its original form as it only has two of the three copies it should have.

With respect to the Debtors' argument that the NOR was defective because the rescission deadline was incorrect, the Defendants assert that the United States Court of Appeals for First Circuit has previously rejected this argument in *Palmer v. Champion Mortgage*.[86]

The Defendants further argue that any error made was bona fide and a complete defense to the Debtors' claims of rescission and statutory damages.  They assert that Option One implemented comprehensive safeguards to assure that borrowers were provided with sufficient copies of the NOR. In support of this, the Defendants aver that both Lisa Clary's and Attorney Marks' testimony established that this was Option One's procedure.  Moreover, they assert that this procedure is manifest in the Instructions to the Closing Agent, Affidavit of Settlement Agent, and the Acknowledgment.  If copies of the NOR were omitted, the Defendants contend that there was nothing Option One did or failed to do that caused such an omission.  The Defendants also note that the statute does not exclude the failure to provide notice, as the express language states that "[e]xamples of a bona fide error include, but are not limited to . . . ."[87]    Further, the Defendants assert that Wells Fargo, as an assignee, is not subject to statutory damages for alleged violations that

---

[86] *Palmer v. Champion Mortgage*, 465 F.3d 24 (1st Cir. 2006).

[87] Mass. Gen. Laws ch. 140D, § 32(c).

are not apparent on the face of the loan documents.[88]

Finally, the Defendants argue that if the Debtors cannot demonstrate an ability to tender back amounts loaned to them, their rescission claim must fail. The Defendants contend that the purpose of rescission is to undo the transaction and return the parties to the same position they would have been had the transaction not occurred.[89] As such, rescission should be conditioned on the tender of the loan amount.[90] The Defendants assert that rescission of the loan without requiring tender would be entirely inequitable and constitute a severe penalty to Defendants and an undeserved windfall for the Debtors. They note that *In re Myers* and *In re Whitley* dealt with relatively small sums while this case involves over $180,000.

## IV. DISCUSSION

### A. TILA and the CCCDA

"Both TILA and CCCDA were enacted 'to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing and credit card practices.'"[91] "Both acts provide that a borrower whose loan is secured by his principal dwelling and who has been denied the requisite disclosures may rescind the loan

---

[88] Mass. Gen. Laws ch. 140D, § 33.

[89] *American. Mortgage Network, Inc. v. Shelton*, 486 F.3d 815, 820 (4th Cir. 2007); *Bustamente v. First Fed. Savs. & Loan Ass'n of San Antonio*, 619 F.2d 360, 365 (5th Cir. 1980).

[90] *Egipciaco Ruiz v. R & G Fin. Corp.*, 383 F.Supp.2d 318, 322 n.2 (D.P.R. 2005).

[91] *In re Fidler*, 226 B.R. at 736 (*quoting Beach v. Ocwen Federal Bank*, 523 U.S. 410, 412 (1998).

18

transaction."[92]  Although TILA contains a three year statute of limitations for damages and rescission claims while CCCDA provides for a four year statute of limitations, the provisions of the two statutes are substantially the same.[93]  Therefore, TILA remains relevant to this inquiry and federal court decisions with respect to TILA are instructive in construing the parallel provisions of the CCCDA.[94]

The Massachusetts analogue to Regulation Z provides in relevant part:

(2) (a) Notice of Right to Rescind. In a transaction subject to rescission, *a creditor shall deliver two copies of the notice of the right to rescind to each consumer entitled to rescind.* The notice shall be on a separate document that identifies the transaction and shall clearly and conspicuously disclose the following:
    1. The retention or acquisition of a security interest in the consumer's principal dwelling.
    2. The consumer's right to rescind the transaction.
    3. How to exercise the right to rescind, with a form for that purpose, designating the address of the creditor's place of business.
    4. The effects of rescission, as described in 209 CMR 32.23(4).
    5. The date the rescission period expires.
  (b) Proper form of notice. To satisfy the disclosure requirements of 209 CMR 32.23(2)(a), the creditor shall provide a notice that conforms with the model forms in Appendix H of Regulation Z, as appropriate, or a substantially similar notice.[95]

Under normal circumstances, a consumer may exercise the right to rescind until midnight of the third business day following consummation, delivery of the NOR, or delivery of all material disclosures, whichever occurs last.[96]  Failure to deliver the NOR or material disclosures triggers a four year

---

[92] *Id.  See* 15 U.S.C. § 1635; Mass. Gen. Laws ch. 140D, § 10.

[93] *In re Desrosiers*, 212 B.R. at 722.  *See* 15 U.S.C. §§ 1635(f), 1640(e); Mass Gen. Laws ch. 140D, § 10(f).

[94] *In re Fidler*, 226 B.R. at 736; *Mayo v. Key Fin. Serv., Inc.*, 424 Mass. 862, 864 (1997).

[95] 209 C.M.R. § 32.23(2) (emphasis added).

[96] Mass. Gen. Laws ch. 140D, § 10(f); 209 C.M.R. § 32.23(1)(c).

19

extended period in which to exercise the right to rescind.[97]

It is without question that the form of the NOR was sufficient under Massachusetts law as Option One used the model form NOR in Appendix H of Regulation Z.  Moreover, the Debtors' rescission was well within the four year extended rescission period.  As such, I must now address whether the copies of the NOR were facially defective.

B.  Adequacy of the Notice

The Debtors argue that even if they received four copies of the NOR, based upon the copies contained within the Closing Booklet, the NOR was legally insufficient because the stated deadline was measured as three business days after the closing, rather than from receipt.   Assuming, *arguendo*, that the Debtors did not receive the Closing Booklet at the closing, this argument fails as a matter of law. The United States Court of Appeals for the First Circuit previously addressed identical facts in *Palmer v. Champion Mortgage*.[98]  Utilizing an objective standard, the court stated that:

> [The NOR] clearly and conspicuously indicates that the debtor can rescind "within three (3) business days from whichever of [three enumerated] events occurs last." Although the Notice does state in part that rescission has to occur "no later than midnight of APRIL 01, 2003," the plaintiff wrests this statement from its contextual moorings. The statement is followed immediately by a parenthetical reading "(or midnight of the third business day following the latest of the three (3) events listed above)." We fail to see how any reasonably alert person-that is, the average consumer-reading the Notice would be drawn to the April 1 deadline without also grasping the twice-repeated alternative deadlines.
>
> This facial transparency is bolstered by the fact that the language of the Notice closely tracks the language of the model form. This is, at the very least, prima facie

---

[97] *Id.*

[98] *Palmer v. Champion Mortgage*, 465 F.3d 24 (1st Cir. 2006). *See also Santos-Rodriguez v. Doral Mortgage Corp.*, 485 F.3d 12 (1st Cir. 2007); *Megitt v. Indymac Bank F.S.B.*, No. 07-30108-MAP, 2008 WL 1748211 (D. Mass. Mar. 31, 2008).

20

evidence of the adequacy of the disclosure. *See* 12 C.F.R. § 226 Supp. I, Intro. para. 1 ("Good faith compliance with [the Federal Reserve Board's] commentary affords protection from liability under [the TILA].").[99]

Therefore, the copies of the NOR are not defective due to the inclusion of the December 1, 2005 date regardless of when they were received. I must now consider whether each Debtor received two copies of the NOR.

C. Delivery

Mass. Gen. Laws ch. 140D, § 10 provides in relevant part:

(c) Written acknowledgment of receipt of any disclosures required under this chapter, or any rule or regulation issued thereunder, by a person to whom information, forms, and a statement is required to be given pursuant to this section does no more than create a rebuttable presumption of delivery thereof.

Exactly what constitutes sufficient evidence to rebut the presumption is not set forth in either statute or regulations. One court has stated that to rebut the presumption, a party must provide evidence that "would support a jury finding of the nonexistence of the presumed fact."[100] Several other cases, however, indicate that a TILA plaintiff attempting to overcome the presumption faces a low burden.[101] These cases hold that to rebut the presumption of delivery, the Debtors simply must present some evidence to the contrary.[102] In *Williams v. First Gov't Mortgage and Investors*

---

[99] *Id.* at 28-29.

[100] *Jackson v. New Century Mortgage Corp.*, 320 F.Supp.2d 608, 611 (E.D. Mich. 2004) (*quoting* 21 Wright & Graham, Federal Practice and Procedure: Evidence § 5122 (1977)).

[101] *Macheda v. Household Fin. Realty Corp. of New York*, No. 5:04-CV-325, 2008 WL 2562003 (N.D.N.Y. Jun. 26, 2008); *Davison v. Bank One Home Loan Services*, No. 01-2511-KHV, 2003 WL 124542 (D. Kan. Jan. 13, 2003); *Cooper v. First Gov't Mortgage and Investors Corp.*, 238 F.Supp.2d 50, 64 (D.D.C. 2002).

[102] *Cooper*, 238 F.Supp.2d at 64 (*citing Williams v. First Gov't Mortgage and Investors Corp.*, 225 F.3d 738, 751 (D.C. Cir. 2000).

*Corp.*,[103] the United States Court of Appeals for the D.C. Circuit held that the presumption of

delivery imposes of the TILA plaintiff "the burden of going forward with evidence to rebut or meet

the presumption, but [does] not shift to [him] the burden of proof." The Court of Appeals had

previously explained that:

> As Dean Wigmore has explained, "the peculiar effect of a presumption 'of law' (that
> is, the real presumption) is merely to invoke a rule of law compelling the (trier of
> fact) to reach a conclusion in the absence of evidence to the contrary from the
> opponent. If the opponent does offer evidence to the contrary (sufficient to satisfy the
> judge's requirement of some evidence), the presumption disappears as a rule of law,
> and the case is in the (factfinder's) hands free from any rule." As more poetically the
> explanation has been put, "(p)resumptions . . . may be looked on as the bats of the
> law, flitting in the twilight, but disappearing in the sunshine of actual facts."[104]

It is undisputed that the Debtors signed the acknowledgment. To rebut the presumption of

delivery, the Debtors, in part, raise what has been referred to as the "envelope theory" or "folder

theory." Essentially, they argue that the presumption that they received four copies of the NOR is

rebutted by the fact that the Closing Booklet contains, at best, only two. The sufficiency of the

"folder theory" is related to the reliability of the folder itself. In *Jackson v. New Century Mortgage

Corp.*, for example, the court held that the borrowers failed to rebut the presumption of delivery

because they acknowledged receiving documents at the closing which were not in the sealed

envelope.[105] Similarly, in *Gaona v. Town & Country Credit*, the court found that the closing folder

was insufficient to rebut the presumption absent more compelling evidence where the testimony and

affidavits show the borrowers were unsure as to whether they received the notices.[106] Other courts,

---

[103] *Williams v. First Gov't Mortgage and Investors Corp.*, 225 F.3d at 751.

[104] *Legille v. Dann*, 544 F.2d 1, 6 (D.C. Cir. 1976) (footnotes omitted).

[105] *Jackson*, 320 F.Supp.2d at 611.

[106] *Gaona*, 2001 WL 1640100 at *3.

however, have found the production of closing documents stored in a manner reasonably ensuring

their integrity in conjunction with testimony supporting their reliability is sufficient to rebut the

presumption.[107]  Still, numerous other courts have found a borrower's testimony, by itself, may be

sufficient to overcome the presumption of delivery.[108]

In the present case, the Closing Booklet presently contains only two copies of the NOR

printed on a single doubled-sided sheet of paper.  The Defendants question the Closing Booklet's

integrity, asserting the Debtors cannot establish a "reliable chain of custody" because the Debtors,

their daughter, or even their attorney could have removed pages.  I disagree.  A closing booklet is

not a murder weapon or controlled substance which requires a perfect chain of custody to prove guilt.

Such a standard is illogical and inappropriate to apply to a TILA case.  The reason is obvious: *a*

*lender would never be satisfied with any chain of custody*.  If the Debtors themselves cannot

maintain possession of their own Closing Booklet, the only reliable ones would be those containing

---

[107] *Webster v. Centex Home Equity Corp. (In re Webster)*, 300 B.R. 787, 800 (Bankr. W.D. Okla. 2003) (non-delivery established by documentary evidence and testimony of two witnesses); *Davison*, 2003 WL 124542 *4;  *Cooper*, 238 F.Supp.2d at 64-65. *But see Payne v. Equicredit Corp. of America*, No. CIV.A. 00-6442, 2002 WL 1018969 *4 (E.D. Pa. 2002) (a plaintiff may establish a TILA violation based solely on documentary evidence).

[108] *Stutzka v. McCarville*, 420 F.3d 757, 762 (8th Cir. 2005) (borrower's testimony sufficiently rebuts the presumption of delivery to raise a trial worthy issue of fact); *Jones v. Novastar Mortgage, Inc. (In re Jones)*, 298 B.R. 459 (Bankr. D. Kan. 2003) (same); *Williams v. BankOne, N.A. (In re Williams)*, 291 B.R. 636, 648 (Bankr. E.D. Pa. 2003) (debtor's trial testimony sufficiently credible to rebut the presumption of delivery); *Williams v. Gelt Fin. Corp.*, 237 B.R. 590, 595 (E.D. Pa. 1999) (same); *see also Williams v. First Gov't Mortgage and Investors Corp.*, 225 F.3d at 751 (borrower's testimony too incredible to rebut presumption); *Basham v. Fin. America Corp.*, 583 F.2d 918 (7th Cir. 1978) (plaintiff did not rebut presumption by filing an affidavit or otherwise pleading further); *Sibby v. Ownit Mortgage Solutions, Inc.*, 240 Fed.Appx. 713 (6th Cir. 2007) (borrower's contradictory testimony was insufficient to rebut presumption where the borrower failed to respond to discovery and a statement that all notices were received was deemed admitted); *but see Oscar v. BankOne, N.A.*, No. Civ.A.05-5928, 2006 WL 401853 *3 (E.D. Pa. Feb. 17, 2006) (contradictory testimony, by itself, is insufficient to rebut the presumption).

exactly what the lender alleges it should.  Moreover, none of the above cited cases contained

exhaustive factual findings with respect to the chain of custody of the respective documents.

The Debtors provided a reasonable account of the Closing Booklet's chain of custody

supported by witness testimony and documentary evidence.  The Debtors and Attorney Koban all

testified that they did not remove pages from the Closing Booklet.  Mere allegations to the contrary,

or that some third party intentionally removed pages from the Closing Booklet, are speculative and

without merit.  Additionally, the Closing Booklet is identical to the copy prepared by Attorney

Koban at the time he removed the binding.  It is curious that the Defendants make much of Attorney

Koban removing the Closing Booklet's binding because even assuming the binding had been intact,

Attorney Marks' testimony clearly indicates that the it would not contain four copies of the NOR.[109]

Under these circumstances, I find the Closing Booklet sufficiently reliable evidence that it only ever

contained two copies of the NOR on a single double-sided sheet of paper.

While the Defendants are correct that the Debtors did not, and cannot, state affirmatively how

many copies of the NOR were originally in the Closing Booklet, the Debtors credibly testified that

they received no documents at the closing.  Based on Attorney Marks' testimony, the only way the

Debtors would have received a total of four copies of the NOR is if they received the two loose

copies from him at the closing.  This testimony in conjunction with the Closing Booklet successfully

rebuts the presumption of delivery.

As the Debtors presented sufficient evidence to rebut the initial presumption of delivery, the

---

[109] I also note there is no requirement under the law or contained within the Instructions to
Closing Agent that the closing documents be bound.

24

burden now shifts to the Defendants to prove that each Debtor received two copies of the NOR.[110]

At trial, the only evidence beyond the Acknowledgment that the Debtors each received two copies of the NOR was Attorney Marks' testimony based on his routine practice and the executed copies of the Affidavit of Settlement Agent and Instructions to Closing Agent in which he contemporaneously averred that he provided each Debtor with sufficient copies of the NOR. From the outset, I note that Attorney Marks conceded he has no independent recollection of this closing. While the two executed documents might otherwise be persuasive in light of his routine practice, I find that his testimony as a whole places their veracity in doubt. Attorney Marks testified that he never took any independent action to confirm that a bound closing booklet contained sufficient copies of the NOR and instead relied on PSS to provide a complete set of closing documents. If he never made an independent inspection of the closing booklet, he simply could not state to a certainty that he gave sufficient copies of the NOR. It is also incredible to say that he knew how many copies of the NOR were enclosed in any bound closing booklet simply because he had an identical set. Again, without looking at them, such an assertion is without support. The fact that the Closing Booklet contains only two copies of the NOR, and not the three he testified it should, also suggests that his testimony should be given little weight.

In the absence of any credible evidence proving that each Debtor received two copies of the NOR, I find that they did not. I need not reach the issue of whether the two copies the Debtors did receive constitute only one due to the fact they are printed on a single doubled-sided sheet of

---

[110] The parties stipulated that once the Debtors have rebutted the presumption of delivery, the burden of proof shifts to the Defendants. PTS at ¶ IV.4. I note this because some of the authority cited above suggests the initial presumption does not shift the burden of proof to the borrower.

paper.[111]

In light of this violation of the CCCDA, I must now consider whether the Defendants are

entitled to a bona fide error defense.

D. <u>Bona Fide Error Defense</u>

The CCCDA contains a "safe harbor" provision for bona fide errors.  Mass. Gen. Laws ch.

140D, § 32 provides in relevant part:

> (c) A creditor or assignee may not be held liable in any action brought under this
> section or section ten for a violation of this chapter, or any rule or regulation issued
> thereunder, if the creditor or assignee shows by a preponderance of evidence that the
> violation was not intentional and resulted from a bona fide error notwithstanding the
> maintenance of procedures reasonably adopted to avoid any such error. A bona fide
> error includes, but shall not be limited to, clerical, calculation, computer malfunction
> and programming, and printing errors, except that an error of legal judgment with
> respect to a person's obligations under this chapter, or rule or regulation issued
> thereunder, is not a bona fide error.[112]

To fall within this safe harbor, a creditor must first demonstrate that the error was bona fide.  While

the examples included in the statute are expressly not exhaustive, the majority of cases hold that

bona fide errors are limited to those that are purely clerical in nature.[113]  Second, the creditor must

demonstrate that procedures  reasonably adopted to avoid such errors were in place and maintained.

Many courts have interpreted the analogous provision of TILA to require additional procedures

designed to avoid and prevent errors which might otherwise slip through procedures aimed at good

---

[111] I note, however, that this might constitute a bona fide error as it could be the result of a
"clerical" or "printing error."  *See* subsection D infra.  In any event, lenders would be well
advised to avoid such issues in the future.

[112] Mass. Gen. Laws ch. 140D, § 32(c).

[113] *Bizier v. Globe Fin. Servs., Inc.*, 654 F.2d 1 (1st Cir. 1981); *Ives v. W.T. Grant Co.*,
522 F.2d 749 (2d Cir. 1975); *Haynes v. Logan Furniture Mart*, 503 F.2d 1161 (7th Cir. 1974);
*Smiley v. Feldman Furniture Co. (In re Smiley)*, 84 B.R. 6, 8 (Bankr. D.R.I. 1988); *Boyajian v.
Assocs. Fin. Servs. Co. of Rhode Island (In re Sherman)*, 13 B.R. 259 (Bankr. D.R.I. 1981).

faith compliance.[114]

In the present case, the Defendants have not demonstrated that the failure to provide each Debtor with two copies of the NOR was the result of bona fide error.  First, the Defendants presented no evidence at trial that the errors were unintentional.  Second, evidence regarding Option One's compliance procedures indicates that they are insufficient.  Here, Option One's procedure, as demonstrated by the Instructions to Closing Agent, required the closing agent to provide each borrower with two copies of the NOR and sign the Affidavit of Settlement Agent attesting to the fact that he had done so.  The closing agent would then forward the loan papers, including the Acknowledgment, signed Affidavit of Settlement Agent, and signed Instructions to Closing Agent, to the lender.  The problem is apparent.  Option One never verified that the borrowers received a sufficient number of copies of the NOR and these procedures are not designed to do so.  Instead, through an affidavit, they merely require the closing agent attest to delivery.  The verification of the Affidavit of Settlement Agent is insufficient because it places the rechecking mechanism, if it could even be called that, in the person who made the mistake in the first place.  The present case is illustrative of the problem: Attorney Marks testified that he signed the Affidavit of Settlement Agent without ever having confirmed the contents of the Closing Booklet.  In this context, it is clear that Option One's procedures are not reasonably designed to avoid such errors.

---

[114] *See Thomka v. A. Z. Chevrolet, Inc.*, 619 F.2d 246 (3d Cir. 1980); *Hutchings v. Beneficial Fin. Co. of Oregon*, 646 F.2d 389 (9th Cir. 1981);  *Gallegos v. Stokes*, 593 F.2d 372 (10th Cir. 1979); *Mirabal v. General Motors Acceptance Corp.*, 537 F.2d 871 (7th Cir. 1976), *overruled on other grounds by*, *Brown v. Marquette Sav. and Loan Ass'n*, 686 F.2d 608 (7th Cir. 1982); *Brown v. National Permanent Federal Sav. and Loan Ass'n*, 526 F. Supp. 815 (D.D.C. 1981), *aff'd in part, remanded in part on other grounds*, 683 F.2d 444 (D.C. Cir. 1982); *Webster*, 300 B.R. at 800; *Ralls v. Bank of New York (In re Ralls)*, 230 B.R. 508 (Bankr. E.D. Pa. 1999).

E. Tender Obligation

Upon the valid exercise of the right of rescission, the security interest becomes void and

borrower is not liable for finance or any other charges or interest.[115] Within twenty calendar days

of the receipt of the NOR, the creditor shall return all money or property given in connection with

the transaction and take any necessary action to terminate its security interest.[116] Once this occurs,

the borrower must tender the money or property loaned back to the creditor.[117]

I previously held that rescission by an obligor is not conditioned by tender or payment in the

context of a bankruptcy case.[118] In *Myers*, I relied on the following passage by Judge Deitz

explaining the difference between cases where the obligor is subject to a bankruptcy proceeding and

those where the obligor is not:

> In a non-bankruptcy setting, the rights and duties of the parties upon TIL[A] rescission are clear and absolute. Each party must make the other as whole as he would have been had the contract never been entered into. In the absence of bankruptcy, there is no legal impediment to either party doing what is required to restore the status quo ante. Consequently, the creditor's statutory duty to perform first merely establishes the order of performance; it does not alter the ultimate effect on the remedy.

> Bankruptcy, however, relieves the debtor from his obligation to pay the creditor upon rescission. Conditioning rescission upon the debtor's payment therefore imposes an obligation from which the debtor has been legally freed. Unlike the situation absent bankruptcy, there is a legitimate, legal impediment to the debtor's reciprocal performance. It would be palpably unfair to deny the relief to which a consumer is entitled under TIL[A] because that consumer has also availed himself of bankruptcy relief. To do so would require that the consumer choose between bankruptcy and

---

[115] Mass. Gen. Laws ch. 140D, § 10(b); 209 C.M.R. § 32.23(4)(a).

[116] Mass. Gen. Laws ch. 140D, § 10(b); 209 C.M.R. § 32.23(4)(b).

[117] Mass. Gen. Laws ch. 140D, § 10(b); 209 C.M.R. § 32.23(4)(c).

[118] *Myers*, 175 B.R. at 129. *See also Whitley*, 177 B.R. 142.

TIL[A], something neither form of statutory relief contemplates.[119]

Essentially, when a borrower rescinds a transaction and the security interest is terminated as a matter of law, the creditor is left with an unsecured debt. Outside a bankruptcy proceeding, this characterization is of little consequence because unsecured debts must otherwise be paid in full, failing which, a creditor may take steps to reacquire a security interest. In a bankruptcy proceeding, however, unsecured debts are paid pro rata and may be discharged without payment. Requiring a Chapter 13 Debtor to tender the full amount of the loan on a creditor's now unsecured claim would unfairly discriminate among unsecured claims in violation of 11 U.S.C. § 1322(a)(3).

In this case, Debtors sent a valid notice of rescission to the Defendants during the extended rescission period afforded them by the Defendants' failure to provide each of them with two copies of the NOR.[120] As such, the Defendants' security interest is void and they hold nothing more than an unsecured claim which will receive the same dividend as other unsecured claims under the Debtors' Chapter 13 plan. Moreover, the Debtors are only liable for the principal of the loan, minus the $16,143.32 which the parties stipulated was given by the Debtors in connection with the Refinancing, as they are no longer liable for any finance or other charges.[121] While this circuit does not apply a hyper-technical standard of compliance to TILA, it nonetheless remains a strict liability

---

[119] *Meyers*, 175 B.R. at 128-129 (*quoting In re Piercy*, 18 B.R. 1004, 1007-08 (Bankr.W.D.Ky.1982)).

[120] I note that the Debtors' citation to TILA provisions and not the CCCDA in their written notice of rescission does not render the rescission defective. *See Belini v. Washington Mutual Bank, F.A.*, 412 F.3d 17, 27 (1st Cir. 2005).

[121] *See* Mass. Gen. Laws ch. 140D, § 10(b); 209 C.M.R. § 32.23(4)(a).

statute.[122]  As such, I find the Defendants' equitable arguments unpersuasive.

F. <u>Damages</u>

With respect to damages, Mass. Gen. Laws ch. 140D, § 32 provides the following:

(a) Except as otherwise provided in this section, any creditor who fails to comply
with any requirement imposed under this chapter or any rule or regulation issued
thereunder including any requirement under section ten with respect to any person
is liable to such person in an amount equal to the sum of:
> (1) Any actual damage sustained by such person as a result of the
> failure;
> (2) (a) In the case of an individual action, twice the amount of any
> finance charge in connection with the transaction, except that the
> liability under this clause shall not be less than one hundred dollars
> nor greater than one thousand dollars . . .
> (3) In the case of any successful action to enforce the foregoing
> liability or in any action in which a person is determined to have a
> right of rescission under section ten, the costs of the action, together
> with a reasonable attorney's fee as determined by the court.[123]

Section 33, however, limits the liability of an assignee to those violations which are apparent on the

face of the disclosure statement.[124]  "A violation apparent on the face of the disclosure statement

includes, but is not limited to (i) a disclosure which can be determined to be incomplete or inaccurate

from the face of the disclosure statement or other documents assigned, or (ii) a disclosure which does

not use the terms required to be used by this chapter, or any rule or regulation issued thereunder."[125]

Additionally, section 10(g) states that "[i]n any action in which it is determined that a *creditor* has

violated this section, in addition to rescission the court may award relief under section thirty-two .

---

[122] *See Santos-Rodriguez*, 485 F.3d at 16-17; *Barnes v. Fleet Nat. Bank, N.A.*, 370 F.3d
164 (1st Cir. 2004).

[123] Mass. Gen. Laws ch. 140D, § 32(a)(1)-(3).

[124] Mass. Gen. Laws ch. 140D, § 33(a).

[125] *Id.*

. . .”[126]

It is undisputed that the Debtors have not suffered any actual damages. They are, however, each entitled to statutory damages in the amount of $1,000 each due to Option One's failure to provide each Debtor two copies of the NOR. The Debtors also seek statutory damages against Wells Fargo for its failure to comply with the Debtors' rescission notices. Because Wells Fargo is an assignee and the Acknowledgment precludes a finding that a violation was apparent on the face of the documents, statutory damages are inappropriate.

As the Debtors are also entitled to reasonable attorney's fees in connection with this litigation, the Court shall consider such an award upon the filing of a fee application which comports with the requirements of MLBR 2016-1.

G. The Objection to Claim

In light of my findings with respect to the Debtors' CCCDA claims, the Objection is sustained. I find that Option One holds a unsecured claim in the amount of $142,806.68.[127]

V. CONCLUSION

In light of the foregoing, I will enter judgment in favor of the Debtors and enter order sustaining the Objection.

_____
William Hillman
United States Bankruptcy Judge

Dated: July 7, 2008

---

[126] Mass. Gen. Laws ch. 140D, § 10(g) (emphasis added).

[127] The principal amount of the loan ($158,950.00), as the Debtors are not liable for finance or any other charges, minus the funds given by the Debtors in connection with the Refinancing ($16,143.32).